# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTIAN BLACKWELL-MURRAY,   :
                                     :     CIVIL ACTION
               Plaintiff,      :
                                       :
         v.                 :
                                       :     NO.    12-5319
PNC BANK,                  :
                                       :
            Defendant.     :

## MEMORANDUM

BUCKWALTER, S. J.                                     August 8, 2013

Currently pending before the Court is Defendant PNC Bank's ("PNC") Motion for Summary Judgment. For the following reasons, the Motion is granted in its entirety.

## I.    FACTUAL BACKGROUND[1]

### A.    Plaintiff's Employment with PNC

On April 30, 2008, Plaintiff, Christian Blackwell-Murray, an African American male, submitted an application ("Application") for employment with Defendant PNC as a branch manager. (Def.'s Mot. Summ. J., Ex. A, Dep. of Christian Blackwell-Murray ("Blackwell-

---

[1] The factual history is taken from Defendant's Statement of Undisputed Material Facts, Plaintiff's Response to Defendant's Statement, and the supporting evidence submitted by the parties. To the extent the parties agree on certain facts, the Court takes them as true for summary judgment purposes. Because Plaintiff does not offer a separate recitation of the facts, other than admissions or denials of Defendant's allegations, the Court follows the chronology provided by Defendant.

Murray Dep.") 39:3–40:14, Apr. 4, 2013.)[2]  On July 18, 2008, PNC's Senior Vice President,

Banking Sales Manager, Judy Bell, offered Plaintiff employment for the De Novo Branch

Manager, Vice President position at PNC's branch in East Bradford.  (Blackwell-Murray Dep.

48:22–49:9 & Ex. 2.)  Plaintiff accepted the offer and began work for PNC on August 4, 2008.

(Id. at 49:7–9 & Ex. 2.)

> The job description for Plaintiff's position was as follows:

> Lead and direct all new branch sales and service activities and business
> development/community activities to achieve profit, deposit growth, sales revenue,
> unit production, market share and customer/employee satisfaction goals for the
> office.  Responsible for opening and managing a new branch with no initial customer
> and deposit base.  In the initial period, until significant customer/deposit base is
> acquired, the focus will be on new business development by generating sales through
> working the market and interacting with the local community.  In addition, key
> accountabilities include continuous development of branch staff, marketing events
> in the community and the development and implementation of a sales strategy to
> drive branch performance.  The De Novo Branch Manager continuously works to
> directly lead, coach and performance-manage the staff, as well as ensure the
> successful development and performance of all employees in the office in the areas
> of customer experience, service excellence, sales management, leadership and results.

(Id., Ex. 4.)

> Plaintiff, however, testified that he was not fully responsible for his employees'

performance in the branch.  (Blackwell-Murray Dep. 155:4–7.)  Rather, his only job was to check

---

[2]  Defendant's Statement of Facts contends that, on the Application, Plaintiff signed his
name acknowledging that everything in that document was true and accurate.  (Id. at 40:5–11.)
When asked on the Application if he had ever been discharged, asked to resign or resigned by
mutual agreement from former employment, Plaintiff responded, "No."  (Blackwell-Murray
Dep., Ex. 1.)  Contrary to that representation, however, Plaintiff had recently been discharged by
two former employers, Atlanta Bread Company and Blockbuster.  (Def.'s Mot. Summ. J., Ex. B,
2006 Deposition of Christian Blackwell-Murray ("2006 Blackwell-Murray Dep.") in  Coleman v.
Blockbuster, 127:17–129:2, 135:6–24, May 2, 2006.)  This purported misrepresentation,
however, was never cited by Defendant as a reason for Plaintiff's eventual termination from
PNC.

certain logbooks, which contain notations of what each employee did and when they did it, and to have morning huddles and scheduled operations meetings. (Id. at 155:11–18, 156:19–159:3, 169:19–169:5.) When he saw their signatures in the logbooks next to the notations, he knew that his staff did what they were supposed to do. (Id. at 155:14-118.) He commented that, if he had to go back and physically check everything, there would have been no point in having employees. (Id. at 155:19–24, 157:15–21.)

On June 9, 2009, Plaintiff's supervisor, Judy Bell, issued Plaintiff a Corrective Action Form. (Blackwell-Murray Dep., Ex. 11.) The Form noted that a $48,000 wire was given to Plaintiff by his Assistant Manager and Plaintiff called it in without verifying it. (Id.) While embezzlement was being investigated, several operational integrity/procedural violations were uncovered, including numerous teller violations in the teller envelopes, neglect of the audit binder for many months, numerous safe deposit violations, dual control keys in unsecured locations, and keys and combos in the vault being in complete disarray. (Id.) The Form also remarked that, "[a]s the Branch Manager of the East Bradford Branch, Christian is responsible for the operational integrity of the branch including insuring that PNC policies and procedures are adhered to." (Id.) At the bottom, the Corrective Action Form stated, "These are very serious violations. Failure to resolve these issues or any additional violations will result in further disciplinary action up to and including termination." (Id.) Plaintiff discussed these violations with Ms. Bell and signed off on the form. (Id.; Blackwell-Murray Dep. 147:11–154:24.) At his deposition, however, Plaintiff blamed these problems on at least four different employees. (Id. at 147:11–154:24.) He explained that the employees had signed the log book indicating they had done certain tasks when, in actuality, they had not. (Id.) Plaintiff then emphasized that he did

3

not believe that the Corrective Action had anything to do with his improper oversight of the branch. (Id. at 148:12–15.) According to Plaintiff, Ms. Bell allowed the insubordination of his employees to persist despite his complaints and despite Defendant's clear policy to "carry out supervisor's work directions" in Defendant's Employee Expectations Policy. (Pl.'s Resp. Statement Undisputed Facts ¶¶ 13–14.)[3]

## B. Plaintiff's Violations of PNC Policies and Code of Business Ethics

### 1. PNC Policies at Issue

At some point during Plaintiff's employment, several of PNC's policies were implicated by Plaintiff's actions. First, PNC's Code of Business Conduct and Ethics provides, in pertinent part, "As a PNC employee, you are responsible for understanding and adhering to this Code. Always act in a professional, honest, and ethical manner when conducting your activities with and on behalf of PNC." (Blackwell-Murray Dep., Ex. 7.) It goes on to state that:

> Violating relevant laws, regulations, or this Code, or encouraging others to do so, exposes PNC to risk, including risk to its reputation, and therefore may result in disciplinary action up to and including termination of employment.
> . . .
> Business records should always be prepared honestly and accurately. We must never be dishonest or deceptive in creating or maintaining PNC records, or otherwise attempt to mislead PNC customers, management, auditors, or regulators.

(Id.) Plaintiff admits that he was trained on this Code and received an online copy of it. (Blackwell-Murray Dep. 126:12–129:20.)

PNC also maintains a Bonding Policy, which provides:

---

[3] For this proposition, Plaintiff makes broad citations to his deposition, which do not seem to support his point. Moreover, Plaintiff does not attach his deposition to his brief, but rather cites to the portions provided by Defendant. In doing so, he fails to note that some of his cited pages are not provided by Defendant.

To be employed at PNC you must be covered under its fidelity bond at all times. If PNC has a reasonable belief that you have engaged in a dishonest act (whether or not it constitutes a crime), your coverage under the bond is suspended and you cannot continue working at PNC. You cannot return to work at PNC unless and until your bond coverage is reinstated.

. . .

**Expectations and Responsibilities**

You are expected to be truthful and honest at all times when working for and/or representing PNC.

. . .

If PNC believes you may have committed a dishonest act, you automatically are not bonded and you cannot remain at work. Depending on the circumstances, you employment may immediately be terminated.

. . .

Examples

Some examples of dishonest acts that may suspend bond coverage and/or result in termination of employment include, but are not limited to:

  . . .

- notarizing a document when the person does not sign the document in front of you

(Blackwell-Murray Dep., Ex. 17.)

Finally, PNC's Notary Policy provides in pertinent part:

The law requires that when a notary attests to a signature, the person whose signature is being notarized must be present in front of the notary. This law protects not only the individual requesting the notarization, but also the notary and PNC. Violations of this law expose the notary and PNC to unnecessary risk.

It is also a violation of PNC's Code of Business Conduct and Ethics for any employee to ask a notary to attest to the signature of someone who is not present.

. . .

Any employee who engages in any of the above misconduct may be subject to disciplinary action, up to and including termination of employment.

. . .

**What if documents require notarization and the branch employee notary is not available?**

Every effort should be made to have a PNC notary present, especially for Home Equity Loan and Line of Credit closings. If a notary is unavailable, ask the customer to:

- Take the documents to another PNC location and have the documents notarized by that branch employee notary

- Take the documents to a notary outside of the bank.

In either case, the customer(s) **must** be in front of the notary when any document is notarized.

(Blackwell-Murray Dep., Ex. 12.)  Plaintiff indicated that he was familiar with these policies and was trained to know that (1) customers had to be present when getting a loan document notarized and (2) if a notary was unavailable, the customer had to take the documents either to another PNC branch or to a third-party notary outside the bank.  (Blackwell-Murray Dep. 173:14–24, 176:7–16, 180:17–181:13.)  Plaintiff testified, however, that he was told by "everyone at PNC" that he simply had to get the loan notarized, whether or not the customer was actually present. (Id. at 174:12–185:11.)

### 2.    Plaintiff's Alleged Violations of Policies

In early June 2009, PNC terminated the employment of the only notary working at the East Bradford Branch, meaning that for the remainder of Plaintiff's employment, there was no notary onsite.  (Id. at 90:11–20, 183:15–185:11.)   Plaintiff was concerned that if he had customers take the loan documents out of the building to get notarized and they did not bring them back within the time allotted, the loan would be null and void requiring it to be done all over again.  (Id. at 180:21–181:6.)  He went on to explain that, "you will receive loan errors which will go against your—it went against your customer service score.  It went against your bonus for the quarter for the year.  It went against your branch manager CIQ score.  It affected basically all of your metrics if you got loan errors."  (Id. at 181:7–13, see also id. at 90:11–20.)

As such, between June 22, 2009 and September 5, 2009, Plaintiff, on at least five occasions, had loan documents notarized without the customer present.  (Id. at 202:3–209:11.)  He explained that this was to "maintain PNC's brand ease, confidence and achievement."  (Id. at

209:12–15.)  Plaintiff claimed that having documents notarized without the customer present was "industry standard everywhere."  (Id. at 176:17–177:24.)  He also alleged that Market Manager Matthew Farnsworth and PNC Branch Manager Christopher DiBello—both of whom are Caucasian—also had loan documents notarized without the customer present.  (Id. at 177:10–178:20.)  Plaintiff did not know if anyone in management at PNC was aware that DiBello and Farnsworth had done this.  (Id. at 178:21–179:8.)  He also admitted that Farnsworth told him that PNC frowned upon this practice, but it probably would not do anything about it.  (Id. at 177:15–179:8.)  Finally, Plaintiff conceded that, although his supervisor, Bell, told him that he could take documents to another branch to have them notarized, she did not specifically say that he could do so without the customer present.  (Id. at 185:2–11, 188:9–20.)

### C.  Plaintiff's Termination from PNC

In early September 2009, PNC customer service representative Katherine Norton called the Employee Relations Information Center ("ERIC") to report Plaintiff's actions in having documents notarized without the customer present.  (Id. at 137:11–140:13, 195:23–200:6.)  An investigation was commenced by PNC to determine the truth of these allegations. (Id. at 139:1–140:18, 200:17–202:4.)  On September 18, 2009, PNC investigators Rich Kilmon and Laurie Kane met with Plaintiff, who admitted to taking loan documents to a former colleague and notary at the Bank of American branch in Glenside, Pennsylvania, and asking her to notarize them without the customers being present.  (Id. at 203:10–206:6.)  This occurred on at least five occasions.  (Id. at 214:2–218:23.)  Plaintiff also signed a statement admitting as follows:

> I have taken 5 loans to be notarized by an outside party.  I have done this in order to maintain PNC's Brand of Ease, Confidence, and Achievement.  I put myself in the customer's position and asked myself "How would I feel if my bank asked me to go to another establishment and get a document notarized."  Therefore, I took the

documents to a 3rd party.

The 3rd party person is an ex co-worker of mine (I do not want anything to happen to her. She is an elderly woman that was doing me a favor. I will take full responsibility of any consequences that may follow).

I would take pages 2 & 3 of the "Open Ended Mortgage" to my contact. Page 2 would be used to verify my signature in the witness field, and the client's signature would be verified by the signature line on a copy of the client's Driver's Licenses. If the signatures matched, my contact would notarize the documents.

I would like to state for the record that my intentions were good. I do not have the urge, nor the need, to cause any harm to my clients, or to my contact. I just wanted the loan closing process to be easy and non-stressful for my clients.

(Blackwell-Murray Dep., Ex. 15; see also Blackwell-Murray Dep. 206:10–207:5.)

On September 21, 2009, Kilmon called Plaintiff to inform him that he was being terminated from PNC employment. (Id. at 221:5–14.) Kilmon explained that the reasons were Plaintiff's violation of the Notary Policy and the earlier incident with his assistant manager in June 2009. (Id. at 222:1–18.)

## D. Alleged Unpaid Compensation

Plaintiff's base salary for his first year of employment with PNC was $80,000. (Blackwell-Murray Dep., Ex. 2.) He also had the opportunity to earn additional compensation both for his length of service and through the Branch Manager Incentive Plan. (Id.) Under the Third Year DeNovo for Growth Branch Management Incentive Plan, Managers could earn quarterly annual incentives based on their ability to grow their individual branch's controllable contribution, which is essentially the branch's customer revenue less controllable branch expenses. (Blackwell-Murray Dep., Ex. 6.) For the annual incentive, the branch manager serving in that role at the end of the branch's three-year period was eligible for that award. (Id.) If, however, the Branch Manager at the end of the third year had only been at that branch for a

8

portion of the year, the Branch Manager would be eligible for a prorated bonus based on total time spent managing the branch during the third year.  (Id.)  "Any prior Branch Managers of that branch would not be eligible for the bonus."  (Id.)

Under the Incentive Award Payment Schedule, "[a]ll quarterly incentive components are typically paid in the 2nd pay of the 2nd month of the following quarter."  (Id. (emphasis omitted).)  The annual bonus is typically paid "in the 2nd pay of the 2nd month following the end of the three year period."  (Id. (emphasis omitted).)  Further, it provides that "[e]mployees must be employed by Retail Banking and have an 'active' status on Compass (payroll system) as of the payroll processing date, generally the Thursday of the week prior to the incentive pay date, in order to receive an incentive award. . . . Employees inactive as of the payroll processing date will not receive an incentive payment."  (Id.)  The Plan explicitly notes that "incentive considerations should never be a factor behind any customer conversation or transaction," and that "[u]nnecessarily processing or in any other way manipulating transactions for the purpose of personal incentive gain" is contrary to the purpose and spirit of the Plan.  (Id.)

 Pursuant to this Plan, Plaintiff claimed entitlement to both an annual bonus for 2009 and a third quarter incentive bonus.  (Blackwell-Murray Dep. 116:11–117:5, 120:3–17.)  Specifically, he alleged that by the time of his termination, he had already exceeded his goals for the third quarter, which was about to end in another two or three days, and he had already hit the yearly goals for 2009 at that point in time too.  (Id. at 120:3–10.)  Plaintiff admitted, however, that no one told him that he would be paid any bonus if he were no longer employed by the branch.  (Id. at 116:3–10, 325:1–23.)

### E.    Plaintiff's Racial Discrimination Claims

On September 23, 2009, shortly after his termination, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC") alleging race discrimination against PNC. (Blackwell-Murray Dep., Ex. 18.)  As evidence of racial discrimination, Plaintiff first testified that he believed he was hired by his supervisor, Bell, to fulfill a diversity quota.  (Blackwell-Murray Dep. 54:4–22, 72:1–19.)  Notably, however, he did not know if there were any other candidates who were minorities that Bell interviewed and no one ever told him that he was hired only for diversity purposes.  (Id. at 72:20–73:7.)  Plaintiff went on to note that Bell subjected him to some discriminatory treatment towards the end of his employment by tracking his scheduled appointments, without good reason, so she would know his every move.  (Id. at 74:6–75:14.) Plaintiff conceded, however, that all of his staff, comprised of about fifteen people, had raised issues about his hours and about him not being in the branch.[4]  (Id. at 75:15–76:3, 146:1–14.)

Additionally, Plaintiff described discrimination against an African American girl—Tynika Stevens—who was hired to work in the branch.  (Id. at 289:12–291:11.)  When Bell would come into the office, she would always have something negative to say about the way Ms. Stevens dressed, while she did not make any comments to Kathryn Norton, who he described as similarly dressed.  (Id.)  Neither woman was ever disciplined for their dress.  (Id.)  In addition, Plaintiff indicated that he wanted to promote Ms. Stevens to a personal banker position that had

---

[4]  Plaintiff argues that Bell's harassment included her encouragement and allowance of insubordination by Plaintiff's employees.  (Pl.'s Resp. Statement Undisputed Facts ¶ 39.)  For this proposition, however, Plaintiff cites to portions of depositions and/or exhibits not included by either party.  As such, the Court cannot accept such allegations as true.

opened up at the branch, but she did not get it.  (Id. at 291:13–294:14.)  He did not know who got the position because it was filled after his termination.  (Id.)

Finally, Plaintiff complained that, after his termination, Ms. Bell spoke with other potential employers and, as a result, he did not get sought-after positions with other banks.  (Id. at 294:15–301:14.)  Notably, however, Plaintiff did not know what she said or even who exactly she spoke with.  (Id.)  Further, he was only able to speculate that his inability to obtain a new position was because of things said by Bell—as opposed to his former employers at Bank of America—because his interviews were great, but he was denied the positions after the background checks were completed.  (Id. at 299:11–300:10.)

Ultimately, Plaintiff never heard Bell say anything about his race, make any racial slurs, or comment that she did not want to hire or work with African Americans.  (Id. at 288:9–289:1.)  Further, he never heard anyone complain of Bell discriminating against them because of either their race or ethnicity.  (Id. at 289:2–5.)  Nor did Plaintiff ever call ERIC to complain of any discrimination.  (Id. at 130:9–20.)

### F. Plaintiff's Racial Discrimination Claims and Complaints Against Other Employers Both Pre- and Post-Employment with PNC

Plaintiff's work history reflects other allegations of racial discrimination against employers.  First, Plaintiff was employed as a store manager with Blockbuster from November 2003 until he was terminated in January 2005.  (Blackwell-Murray Dep. 16:9–22.)  Subsequently, on August 24, 2005, Plaintiff, along with others, filed a complaint alleging that Blockbuster had discriminated against them on the basis of race in violation of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  (Def.'s Mot. Summ. J., Ex. C.)  On June 30, 2008, Plaintiff's intentional discrimination claims under § 1981 were dismissed on summary judgment because Plaintiff

failed to establish that he was terminated under circumstances that gave rise to an inference of unlawful discrimination. <u>Coleman v. Blockbuster</u>, No. Civ.A.05-4506, 2008 WL 2622912, at *6 (E.D. Pa. June 30, 2008). His Title VII claims were dismissed for failure to exhaust administrative remedies. <u>Id.</u> at *3.

Second, in June 2005, Bank of America hired Blackwell-Murray as a Banking Center Manager. (Blackwell-Murray Dep. 18:1–13.) Plaintiff failed a charge of discrimination against Bank of America in late 2007, while still employed, claiming that he was being discriminated against based on his race. (<u>Id.</u> at 26:13–27:12.) According to Plaintiff, the investigator at the EEOC dismissed the charges because "the people that were doing this to [him] . . . [were] all the same race."[5] (<u>Id.</u> at 31:1–8.)

Finally, Plaintiff was employed by Dollar Tree from April of 2012 to September of 2012. (<u>Id.</u> at 10:21–24.) He was terminated and told it was because of "store appearance." (<u>Id.</u> at 11:14–20.) Plaintiff indicated that he brought an internal complaint against his district manager for harassment. (<u>Id.</u> at 12:3–14, 27:17–28:24.)

### G.    <u>Procedural History of Present Litigation</u>

Following issuance of a right to sue letter from the EEOC, Plaintiff initiated the current lawsuit on September 19, 2012 alleging: (1) race discrimination under Title VII; (2) race discrimination under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat § 951, <u>et seq.</u>; (3)

---

[5] Plaintiff's Response to Defendant's Statement of Undisputed Facts argues that "it would be directly against the EEOC guidelines to dismiss a claim on the basis that the discriminating parties were members of the same protected class." (Pl.'s Resp. Statement Undisputed Facts ¶ 8 (citing EEOC guidelines). Given that Plaintiff himself testified as to what he was told about the merits of his case, it is irrelevant whether what he was told would have been against EEOC guidelines.

a claim under the Wage Payment and Collection Law ("WPCL"), 43 P.S. 260.1, et seq.; and (4) a claim for tortious interference with prospective contractual relations. Following a course of discovery, Defendant PNC filed a Motion for Summary Judgment as to all counts of the Complaint on May 31, 2013. Plaintiff filed a Response on June 20, 2013, and Defendant submitted a Reply Brief on June 27, 2013. The Motion is now ripe for judicial consideration.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the

evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

III.    DISCUSSION

**A.     Claims Under Title VII and the PHRA**[6]

Title VII of the Civil Rights Act of 1964 provides in relevant part that it is an "unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). To establish a claim of discrimination based on disparate treatment, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire. Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme Court set forth the precise framework for analyzing a claim based upon racial discrimination where, as here, there is no direct evidence of discrimination. First, the plaintiff must prove by a preponderance of evidence a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. Next, if the plaintiff establishes a prima facie case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. Id. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981). The inquiry concerning whether the defendant has met its burden of production "can involve no

---

[6] Because the analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical, the Court will consider those two claims together. See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317, n.3 (3d Cir. 2000).

credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. Id.

Finally, if the employer meets its burden of production, the presumption of discrimination created by plaintiff's prima facie case "drops out of the picture." Id. at 511 (citing McDonnell Douglas). In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." Mitchell v. Miller, 884 F. Supp. 2d 334, 370–71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original). "Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." Mitchell, 884 F. Supp. 2d at 371 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147–48 (2000)).

In the case at bar, Plaintiff has no direct evidence of discrimination. As such, the Court must apply the McDonnell Douglas burden-shifting analysis. Defendant asserts that, under this analysis, Plaintiff's claim fails in two respects. First, it contends that Plaintiff cannot establish his prima facie case. Moreover, it argues that, even assuming the existence of the prima facie case, the claim fails because Plaintiff cannot show that Defendant's articulated reason for terminating his employment was a pretext for engaging in race discrimination. The Court examines each argument individually.

## 1.    Prima Facie Case

A plaintiff must first establish a prima facie case of race discrimination by showing that (1) he was a member of a protected class; (2) he was qualified for his position; (3) he had an adverse action taken against him; and (4) similarly situated individuals who were not members of the plaintiff's protected class were treated more favorably. McDonnell Douglas, 411 U.S. at 802; see also Kimble v. Morgan Props., 241 F. App'x 895, 897–98 (3d Cir. 2007). Because the prima facie inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value,* not whether they fit into a mechanical formula." Cobetto v. Wyeth Pharms., 619 F. Supp. 2d 142, 153 n.3 (W.D. Pa. 2007) (emphasis in original).

In the present case, it is undisputed that Plaintiff, as an African American, is a member of a protected class and that he suffered an adverse employment action in the form of termination from employment. Defendant now argues that Plaintiff has failed to establish either that he was qualified for his position or that similarly situated individuals who were not members of his protected class were treated more favorably.

### a.      Whether Plaintiff Was Qualified for the Position

"A court considering a discrimination claim must evaluate the question of the 'plaintiff's qualifications for purposes of proving a prima facie case by an objective standard.'" <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3d Cir. 1995) (citing <u>Weldon v. Kraft, Inc.</u>, 896 F.2d 793, 798 (3d Cir. 1990)).  "[W]hile objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to" consideration of whether the employer's nondiscriminatory reason for discharge is pretext.  <u>Weldon v. Kraft</u>, 896 F.2d 793, 798 (3d Cir. 1990).  "Thus, to deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext." <u>Sempier</u>, 45 F.3d at 729 (quoting <u>Weldon</u>, 896 F.2d at 798–99).

In the present case, Defendant argues that Plaintiff was not qualified for his position due to his violation of the Notary Policy.  As described in detail above, the Notary Policy expressly provides that "the law requires that when a notary attests to a signature, the person whose signature is being notarized must be present in front of the notary."  (Blackwell-Murray Dep., Ex. 12.)  The PNC Bonding Policy then goes on to state that notarizing a document when the person does not sign a document in front of you is considered a "dishonest act that may suspend bond coverage and/or result in termination of employment."  (Blackwell-Murray Dep., Ex. 17.)  Finally, the Bonding Policy provides that "[t]o be employed at PNC you must be covered under its fidelity bond at all times.  If PNC has a reasonable belief that you have engaged in a dishonest

18

act (whether or not it constitutes a crime), your coverage under the bond is suspended and you cannot continue working at PNC."  (Id.)

Defendant now contends that Plaintiff admitted to violating the Notary Policy by taking his customers' loan origination documents to a third-party notary and having them notarized without the customers present.  Having done so, he was no longer covered under PNC's fidelity bond, meaning that he was no longer qualified to work at PNC.

While Defendant's argument is factually correct, it is not proper for consideration at this element of the prima facie case.  Defendant does not contend that Plaintiff lacked the requisite qualifications, education, experience, or skills for the branch manager position from which he was terminated.  Moreover, Defendant has presented no witnesses to explain whether Plaintiff's violation of the Notary Policy automatically rendered him unfit or unqualified for his position.  In other words, it remains unclear whether Plaintiff's actions resulted in his "disqualification" from employment or simply gave PNC a legitimate reason to terminate his employment.  This contention is better left for consideration at the pretext stage of the McDonnell-Douglas analysis.  Accordingly, the Court finds that, for purposes of summary judgment review, Plaintiff has adequately satisfied this element of his prima facie case.

      **b.**     **Whether Similarly Situated Individuals Who Were Not Members of Plaintiff's Protected Class Were Treated More Favorably**

To satisfy the fourth prong of the prima facie case, a plaintiff must establish "that similarly situated individuals outside the plaintiff's class were treated more favorably [that he]."  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273–74 (3d Cir. 2010).  Alternatively, the plaintiff must prove that he was "terminated under circumstances that give rise to an inference of

unlawful discrimination such as might occur when the position is filled by a person not of the protected class." Jones v. Sch. Dist. of Phila. 198 F.3d 403, 410–11 (3d Cir. 1999) (quotation omitted).

Defendant argues that Plaintiff has not proffered any evidence that PNC treated him differently than similarly-situated employees who were not African-Americans or terminated under circumstances giving rise to an inference of unlawful discrimination. By his own admission, Plaintiff violated the Notary Policy by taking loan origination documents to third-parties to be notarized without having the customer present. He explained that he did so to avoid loan errors, which went against his customer service score and his bonus for the year. These violations were reported to PNC's Employee Relations Information Center by a customer service representative at Plaintiff's branch. Thereafter, PNC investigators Kilmon and Kane met with Plaintiff, who admitted to his violations and signed a statement to that effect. Shortly thereafter, Plaintiff was terminated from PNC employment due to his violation of policy.

Plaintiff now fails to present any evidence that his termination was racially motivated. Indeed, Plaintiff's sole argument setting forth his proof as to the fourth element of his prima facie case is as follows:

> There are several reasons why there is a genuine issue of material fact as to whether Defendant's actions give rise to an inference of intentional discrimination.
> Plaintiff was assigned to the Brandywine region, where there are no African-American managers. Blackwell-Murray Dep. at 48-49. He was previously selected to report to the Philadelphia region. Blackwell-Murray Complaint ¶ 36. Defendant was well aware of the racial animus of the customers in Plaintiff's region. Blackwell-Murray Dep. at 106-107. When Plaintiff complained of incidents of racism during his sales visits, he was mocked by his supervisor. Id. Blackwell-Murray Complaint ¶ 53. Despite Plaintiff's high sales metrics, his subordinates refused to follow his orders. Blackwell-Murray Dep. 80, 139-140, 146-150. Plaintiff complained to management about his employees violations of company policy, however he received no assistance and his employees were not reprimanded.

Blackwell-Murray Dep. at Ex. 10. Finally, Plaintiff was terminated despite the fact he was following instructions of his supervisor and the established practices of the East Bradford branch. Id. at 221. Similarly situated Caucasian managers were treated more favorably than Plaintiff. Id. at 177-185.

(Pl.'s Opp'n Summ. J. 8.)

This argument is replete with problems. First, Plaintiff's allegations are largely undocumented. To the extent Plaintiff cites to his Complaint, the Court deems these assertions unsupported by evidence for purposes of summary judgment review. "Because a motion for summary judgment is designed to go beyond the pleadings, a plaintiff may not successfully oppose a summary judgment by merely resting on the allegations contained in his complaint." Heffron v. Adamar of NJ, Inc., 270 F. Supp. 2d 562, 576 (D.N.J. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)). Moreover, many of Plaintiff's evidentiary citations do not support the factual assertions they accompany. For example, Exhibit 10 to Plaintiff's deposition is a report prepared by Bell that (a) describes her conversation with Plaintiff; (b) indicates that Plaintiff's inability to gain the support of his team is affecting his performance; and (c) encourages Plaintiff to seek support from his mentor. It does not show, as Plaintiff suggests, that he complained about his employees and was given no assistance. (Blackwell-Murray Dep., Ex. 10.)

Second, Plaintiff has failed to create a genuine issue of fact as to whether similarly situated individuals were treated more favorably than him. Plaintiff testified that Market Manager Matthew Farnsworth and PNC Branch Manager Christopher DiBello—both of whom are Caucasian—also had loan documents notarized without the customer present. (Blackwell-Murray Dep. 177:10–178:20.) Crucially, however, Plaintiff never saw either of these individuals have documents notarized without the customer present. (Id. at 177:19–24.) Rather, he bases his

21

belief based on "conversations" with Farnsworth who stated that he had done that before. (Id. at 177:23–20.) Moreover, Plaintiff conceded (1) that he had no information that anyone in management at PNC had any knowledge that Farnsworth was doing this, such that he could have been penalized, and (2) that Farnsworth told him that this practice was frowned upon by management. (Id. at 178:21–8.) Finally, Plaintiff admitted that he never had any authorization—let alone direction—from his supervisor Bell to have documents notarized without the customer present. (Id. at 185:2–11.)

Third and finally, Plaintiff has failed to establish that any reasonable jury could find that he was terminated under circumstances that give rise to an inference of unlawful discrimination. Plaintiff has not shown that he was replaced by a Caucasian. Moreover, notwithstanding his allegation that he was suddenly assigned to the racially-hostile Brandywine region, after originally being selected for the Philadelphia region, Plaintiff's offer letter, dated August 4, 2008, shows that he was explicitly offered a position as a branch manager in the East Bradford branch in the Brandywine region. No evidence exists that the Brandywine region had racially biased customers.[7]

---

[7] Indeed, the sole testimony on this issue came from Plaintiff testifying to a conversation with Ms. Bell as follows:

Q. Did Ms. Bell live in the Brandywine region?
A. Yes, she did.
Q. And did she tell you that there was racial tension?
A. Yes.
Q. When?
A. When she used to stop in. I don't remember the date when she used to stop in my office.
Q. Any witnesses to these conversations?
A. No. It was just me and Judy.
Q. Are you aware today as you sit here that Ms. Bell's husband is African American?

As to his supervisor, Bell, Plaintiff admitted that he never heard her say anything about his race, make any racial slurs, or comment that she did not want to hire or work with African Americans.  (Id. at 288:9–289:1.)  Further, he never heard anyone complain of Bell discriminating against them because of either their race or ethnicity.[8]  (Id. at 289:2–5.)

Lastly, to the extent Plaintiff contends that his employees' insubordination was condoned and perpetuated by PNC upper management despite his complaints, Plaintiff's allegations are insufficient to establish discriminatory motive.  Plaintiff has not introduced any evidence

_____

| | |
|---|---|
| A. | I have been informed. |
| Q. | And her children are of mixed race? |
| A. | I've been informed. |
| Q. | And are you aware that they live in the East Bradford region? |
| A. | Correct.  That's all the reason why she would know there is racial tension out there. |
| Q. | Did she give you any examples of that racial tension when she spoke with you? |
| A. | She spoke vaguely.  She didn't go into detail. |
| Q. | When she spoke vaguely, what did she say to you? |
| A. | You know people ignoring her children sometimes when they go to the playground. |

(Blackwell-Murray Dep. 106:1–107:11.)  Such evidence does not allow for any reasonable factfinder to determine that the residents of the Brandywine region, particularly PNC customers, were discriminatory against African-Americans or that PNC purposely assigned Plaintiff to that branch in order to discriminate against him.

[8]  Plaintiff's description of Bell's behavior towards African American branch employee Tynika Stevens is not probative of racial animus.  As noted above, Plaintiff testified that Bell would always negatively comment on Stevens's dress as being inappropriate, while not making such comments about Kathryn Norton who, in Plaintiff's opinion, was similarly dressed.  (Blackwell-Murray Dep. 289:12–291:11.)
    Plaintiff has not presented any testimony from either Bell or Stevens regarding this situation.  Nor has Plaintiff offered any objective basis upon which a reasonable jury could conclude that Bell's comments to Stevens were unfounded or based on her race.  Most importantly, however, Plaintiff has conceded that Stevens was never reprimanded or otherwise disciplined for her dress.  Accordingly, this alleged incident does not establish an form of racial animus.

regarding the racial composition of his employees.  Nor has Plaintiff made any showing—either through direct or circumstantial evidence—that his employees' insubordination was racially motivated rather than as a result of his own leadership deficiencies.  Indeed, Plaintiff admitted that he was not aware of any racial comments by his employees.  (Blackwell-Murray Dep. 85:3–24.)  As to Plaintiff's contention that PNC management did nothing about the insubordination and actually encouraged such behavior, Plaintiff has put forth nothing to support this allegation or to show that it was anybody else's job but his to supervise his employees.  Indeed, the evidence shows that it was Plaintiff's job to "continuously work[] to directly lead, coach and performance-manage the staff, as well as ensure the successful development and performance of all employees in the office in the areas of customer experience, service excellence, sales management, leadership and results."  (Blackwell-Murray Dep., Ex. 4.)  Further, Plaintiff was repeatedly advised of his responsibility to gain support of and lead his team of employees, and to ensure that the employees adhered to PNC policies and procedures.  (Blackwell-Murray Dep., Exs. 10 & 11.)  In other words, Plaintiff has not produced one single piece of evidence—beyond the allegations in his Complaint and Response Brief—that any manager at PNC encouraged or condoned this behavior by the branch employees.

In short, Plaintiff has not satisfied the fourth element of his prima facie case.  He presents no evidence of racial comments or racially motivated behavior.  Further, he fails to create any inference of discrimination by showing that he was replaced by someone outside of his protected class or that similar-situated PNC employees outside of his protected class were treated more favorably.  Given the complete dearth of evidence, the Court does not find the existence of any genuine issue of material fact on this point.

**2.** **Whether Defendant's Legitimate Non-Discriminatory Reason for Terminating Plaintiff's Employment Was Pretextual**

Nonetheless, even assuming *arguendo*, that Plaintiff could establish a prima facie case, his claim of disparate treatment founders at the second and third steps of the McDonnell Douglas analysis. As noted above, once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the challenged adverse employment actions. All the employer need do at this juncture is introduce admissible evidence that, if taken as true, would "*permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons." Mitchell, 884 F. Supp. 2d at 370 (emphasis in original).

Defendant, in this case, has done so. As set forth in detail above, Plaintiff, by his own admission, repeatedly violated PNC's Notary Policy, which prohibits having documents notarized when the customer does not sign the document in front of the notary. That Notary Policy clearly states that "[a]ny employee who engages in any of the above misconduct may be subject to disciplinary action, up to an including termination of employment." (Blackwell-Murray Dep., Ex. 12.) Moreover, the Bonding Policy provides that an employee who commits a dishonest act—such as having documents notarized without the customer present—loses bond coverage under PNC's fidelity bond and must immediately cease working at PNC. (Blackwell-Murray Dep., Ex. 17.)

As Defendant has met its burden of production in this case, the presumption of discrimination now "drops out of the picture" and the burden shifts back to Plaintiff to establish a genuine issue of material fact that Defendant's proffered reasons are merely pretextual. In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must

ultimately convince the trier of fact *both* that the reason was false *and* that a discriminatory animus was the real reason for the adverse employment action at issue. <u>Fuentes</u>, 32 F.3d at 763. Notably, "[l]iability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." <u>Mitchell</u>, 884 F. Supp. 2d at 370–71.

Plaintiff's sole theory of pretext is that he was terminated despite "following the instructions of his supervisor and the established practices of the East Bradford Branch." (Pl.'s Opp'n Summ. J. 8.) Plaintiff then simply argues that "a fact-finder could reasonabl[y] find that each of Defendant's legitimate reasons for termination were based upon practices that were permitted by Plaintiff's supervisors and that Caucasian employees were engaged in, but were not sanctioned for. Alternatively, Plaintiff has demonstrated that Defendant's discriminatory reason was a motivating cause of the adverse employment action." (<u>Id.</u> at 9.)

Again, Plaintiff's arguments stand unsupported by the evidence. As set forth in detail above, Plaintiff has failed to produce evidence either that similarly-situated Caucasian employees engaged in similar conduct or that PNC management knew about the alleged conduct by these employees and failed to sanction them. Moreover, to the extent Plaintiff argues that violations of the Notary Policy were permitted and encouraged by PNC, his contention is unsupported and, in some cases, belied by the evidence of record. Specifically, Plaintiff testified as follows:

> Q. So you thought that it was okay then to get the document notarized eve without the customer present so you wouldn't get a loan error?
> A. The told us the same thing. If we took the packet to another location, the customers weren't with us. We just went to another location and had the notary of that branch notarize the documents.
> Q. Who told you at PNC that you could take the documents to another PNC

branch to get it notarized without the customer present?

A. Everyone at PNC told me that.

Q. Who?

A. Judy told me that.

Q. Judy Bell told you that?

A. Yes. Heather Teneglia told me that. Because I took documents to her branch to have her notary notarize them for me. Chris DiBello, Matt Farnsworth, a lot of people told me that.

Q. When did Judy Bell tell you that you that you can take a document to get notarized without the customer present?

A. Afer this whole situation with Lynsey. And then at that point once Kathryn called the back office, that's when she told me to cease and desist doing all loan closings.

Q. I want to know though, I thought you told me that Judy Bell told you that you could take a document to get notarized without the customer present?

A. Yes.

Q. When did she tell you that?

A. As soon as Lynsey was terminated. I believe Lynsey was terminated in late May, early June of 2009.

Q. And what about Lynsey's termination would trigger Ms. Bell to tell you you can take a document to get notarized without the customer present?

A. Because Lynsey was the only notary that I had in that office.

Q. So Ms. Bell said to you that you could go without a customer and get a document notarized?

A. Yeah. She told me to go over to the neighboring branch and have them—she said have them notarize it or see if they can come here—either/or.

Q. Did she specifically tell you, without the customer being present?

A. She said either take the documents to a neighboring branch or have them come here. She said either/or.

Q. But did she specifically tell you, and I'm talking about Ms. Bell, that you could take the documents or have them come here without the customer present to get it notarized?

A. Yes.

Q. *Those were her words, without the customer present?*

A. *Yes. Well, those weren't her words, without the customer present. But she said you can take the docs—she didn't even mention customer. She said, you can take the documents to a neighboring branch to have them notarized. Customers were not even mentioned. She specifically said, Christian, you can take the documents to a neighboring branch to have them notarized by their notary.*

(Blackwell-Murray Dep. 182:9–185:11 (emphasis added).)[9]  Such testimony does not indicate

any direction that Plaintiff have documents notarized without a customer present in direct

violation of the Notary Policy; rather, it reflects Plaintiff's *inference* from Ms. Bell's statement

that he could conduct notarizations without the customer.  Plaintiff admits that Ms. Bell never

told him that he could violate the Notary Policy.

As to other individuals, Plaintiff goes into detail about only one other PNC

employee—Matthew Farnsworth—who allegedly told him to have documents notarized without

customers present.  Aside from the fact that Plaintiff makes no showing that Farnsworth was his

supervisor or superior to whom he was obligated to listen, the context of Farnsworth's statements

indicates that he actually cautioned Plaintiff that this was a "frowned upon" practice:

| | |
|---|---|
| Q. | Did Matt Farnsworth notarize documents without the customer present? |
| A. | He probably did because he was a branch manager before. |
| Q. | Did you ever see Matt Farnsworth notarize documents or have documents notarized without the customer present? |
| A. | I had conversations with him about it. |
| Q. | What did he tell you? |
| A. | He said PNC frowns upon this.  But they are really not going to bother you because this is—you are doing something the customers wants so they really don't frown upon it. |
| Q. | Did Matt Farnsworth tell you that though that he would take documents to be notarized without the customer present? |
| A. | He was a notary so he would notarize them. |
| Q. | Without the customer present? |
| A. | Yes. |
| Q. | He told you he did that? |
| A. | He said a few times he did, yes. |
| Q. | Did he tell you whether anyone in management at PNC was aware that he |

_____

[9]  Defendant's Reply Brief cites additional testimony wherein Plaintiff admits that neither Bell nor any other supervisor authorized him to violate the Notary Policy or any other PNC Policy.  (Def.'s Reply Br. 3–4.)  Notably, however, the additional pages cited by Defendant are not included as an exhibit to any brief.  Accordingly, the Court disregards any deposition testimony cited in briefs but not provided as a submission to the Court.

|   | was doing this? |
|---|---|
| A. | He didn't tell me. He didn't go into all this. He just said that they frowned—it's frowned upon because you're not supposed to. He said, however, it's industry standard. And they don't really do anything about it. |
| Q. | Did he tell you if anybody knew about it to do anything about it? |
| A. | No, he didn't say. |

(Id. at 178:11–179:8.) Indeed, the only reasonable inference from this testimony is that Plaintiff knew that violations of the Notary Policy were not permitted, but believed that he could potentially get away with it. Such an inference in no way supports Plaintiff's assertion that he was "instructed" to have documents notarized without the customer present in order to close transactions.

In short, Plaintiff has set forth no basis on which a jury could find that Defendant's proffered legitimate, non-discriminatory reason for terminating him was actually pretextual for racial discrimination. Aside from the fact that there is no factual premise on which to disbelieve Defendant's proffered reason, there is also no evidentiary basis on which a jury could rest an affirmative belief that the termination was taken on the basis of an impermissible discriminatory criterion. Accordingly, Plaintiff's discrimination claims fails this portion of the McDonnell Douglas analysis.

### 3. Conclusion as to Discrimination Claim

Given the foregoing, the Court must grant Defendant's Motion for Summary Judgment as to Plaintiff's Title VII and PHRA discrimination claims. As set forth in detail above, Plaintiff's prima facie case fails due to his inability to prove that similarly situated individuals were treated more favorably than him or that his termination occurred under circumstances that give rise to an inference of discrimination. Moreover, even if Plaintiff could succeed on his prima facie case, he has failed to create any genuine issue of material fact on the question of whether Defendant's

legitimate, non-discriminatory reason for his termination—*i.e.*, his repeated violation of the Notary Policy—was a mere pretext for discrimination.  In sum, based on the evidence of record, no reasonable jury could find that Plaintiff was discriminated against by Defendant.  Accordingly, judgment on these claims will be entered in favor of Defendant and against Plaintiff.

**B.     Wage Payment and Collection Law Claim**

Defendant next seeks summary judgment on Plaintiff's claim pursuant to the Wage Payment and Collection Law ("WPCL"), 43 Pa.C.S. § 260.1 et seq.  The WPCL requires employers to pay a separated employee his or her "wages or compensation earned" at the time of separation no later than the employer's next regular payday.  43 Pa. Cons. Stat. Ann. § 260.5.  The WPCL defines wages as "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation."  Id. § 260.2a.  Wages also include fringe benefits provided by an employer.  Id.  The WPCL confers onto employees the ability to institute legal actions to collect wages payable to them by employers.  Id. § 260.9a; Deron v. SG Printing, Inc., No. Civ.A.11-1934, 2012 WL 1902577, at *5 (M.D. Pa. May 25, 2012).

"'[A] prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid . . . . Relief under the WPCL is implausible without [the] existence of a contract.'"  Scott v. Bimbo Bakeries, USA, Inc., No. Civ.A.10-3154, 2012 WL 645905, at *4 (E.D. Pa. Feb. 29, 2012) (quoting Lehman v. Legg Mason, Inc., 532 F. Supp. 2d 726, 733 (M.D. Pa. 2007)).  In other words, "to sustain [a] wage-payment claim[], [the plaintiff] must demonstrate that he was contractually entitled to compensation and that he was not paid."  Divenuta v. Bilcare, Inc., No. Civ.A.09-3657, 2011 WL

1196703, at *9 (E.D. Pa. Mar. 30, 2011). "The contract between the parties governs in determining whether specific wages are earned." Scott, 2012 WL 645905, at *4 (quoting Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990); Laborers Combined Funds v. Mattei, 518 A.2d 1296, 1298 (Pa. 1986)). Notably, "[t]he mere fact that certain compensation is not payable until a future date is not necessarily fatal to a WPCL claim so long as the employee is deemed to have 'earned' it during his employment." Riseman v. Advanta Corp., 39 F. App'x 761, 765 (3d Cir. 2002).

Bonus payments are recoverable under the WPCL. See 43 Pa. Cons. Stat. § 260.2a; Cappuccio v. Pfizer, Inc., No. Civ.A.07-549, 2007 WL 2593704, at *5 (E. D. Pa. Aug. 31, 2007). The burden falls on Plaintiff, however, to prove that the bonus is "earned," i.e. that the right to the wage or bonus vested under the terms of employment. Stebok v. Am. Gen. Life & Acc. Ins. Co., 715 F. Supp. 711, 713 (W.D. Pa. 1989), aff'd, 888 F.2d 1382 (1989). Where a bonus or incentive requires that an employee be actually employed by the employer at the time the payment comes due, the employee has not earned that bonus or incentive. See id.; Cappuccio, 2007 WL 2593704, at *5.

Plaintiff now contends that he is owed (1) incentive payments for the third quarter of the 2009 calendar year (July–September) and (2) an annual bonus payment for 2009. Plaintiff's claim to these payments fails in two respects. First, Plaintiff has not established that, based on his performance, he had earned either of these bonuses. Both plans set forth performance goals that a branch manager would have to reach in order to become eligible for a bonus. (Blackwell-Murray Dep., Ex. 6.) Aside from Plaintiff's unsupported statement that he met all of his incentives, however, the record is devoid of any proof that Plaintiff actually reached any of these

goals.[10]

While Plaintiff now contends that Defendant has not produced any proof that he did **_not_** meet this goals, thereby leaving a genuine issue of material fact on this issue, this argument misunderstands Rule 56 standards. As explained above, although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Plaintiff, in this case, bears the burden of proving his entitlement to the bonuses for purposes of his WPCL claim. Therefore, his failure to come forward with any evidence establishing such entitlement—despite having the benefit of discovery—is fatal to his claim.

Even assuming Plaintiff could prove that he met his incentive goals, his WPCL claim

_____

[10] Plaintiff's cites to his deposition at pages 19–20 as support for his meeting incentive goals, but does not provide these pages and fails to note that they are not included with Defendant's exhibits. (See Pl.'s Opp'n Summ. J. 10.) Nonetheless, the Court will assume for purposes of this Motion that Plaintiff testified on these pages that he met his incentive goals.

cannot succeed because Plaintiff was not employed by Defendant at the time the claimed bonuses

came due.  The contract in this case—the Third Year DeNovo for Growth Branch Mgmt.

Incentive Plan—provides as follows:

> **Incentive Award Payment Schedule**
> All quarterly incentive components are typically paid in the **2ⁿᵈ pay of the 2ⁿᵈ month**
> of the following quarter.  Anticipated pay dates are published on the <u>2009 Incentive
> Pay Dates</u> schedule.
> The Third Year Denovo Deposit Growth bonus incentive is typically calculated and
> paid **in the 2ⁿᵈ pay of the 2ⁿᵈ month** following the end of the three year period.
> . . .
> **Employment status**
> Employees must be employed by Retail Banking and have an "active" status on
> Compass (payroll system) as of the payroll processing date, generally the Thursday
> of the week prior to the incentive pay date, in order to receive an incentive award. .
> . . Employees inactive as of the payroll processing date will not receive an incentive
> payment.

(Blackwell-Murray Dep., Ex. 6 (emphasis in original).)  Plaintiff contends that Defendant did not

provide any evidence of either (1) the start and end date of either the third year period for the

East Bradford Branch—for purposes of the Third Year DeNovo Deposit Growth bonus incentive;

or (2) the end date of the quarter—for purposes of the quarterly incentive components.  This

argument, however, is undermined by Plaintiff's own testimony.  At his deposition, he expressly

testified that, at the time of his termination on September 21, 2009, the third quarter was not

going to end for another two to three days.  (Blackwell-Murray Dep. 120:5–9.)  He subsequently

reiterated his admission that he was not employed at the time that the quarter incentive would

have been paid.  (<u>Id.</u> at 331:7–9.)  He went on to concede that the yearly goal bonus was not paid

until the end of the year, *i.e.* the end of 2009, well after his termination  (<u>Id.</u> at 120:11–13.)  In

light of this uncontradicted evidence that Plaintiff did not have "active" status on the payroll

system at the time of the payroll processing dates for either of his claimed incentive payments,

and given the explicit proscription on incentive payments to individuals no longer employed by PNC at the time the payments are processed, Plaintiff has failed to create an issue of fact as to his entitlement to these incentive payments.

In sum, Plaintiff's WPCL claim must be dismissed. First, Plaintiff has failed to meet his burden of establishing a genuine issue of material fact as to whether he met his performance goals in order to qualify for incentive payments. Moreover, Plaintiff has failed to rebut Defendant's evidence demonstrating that he was not employed at the time the incentive payments came due, as required in order to qualify under the Plan. Accordingly, Defendant's Motion for Summary Judgment on this claim shall also be granted.

## C.     **Tortious Interference With Prospective Contractual Relations Claim**

Finally, Defendant moves for summary judgment as to Plaintiff's tortious interference with prospective contractual relations claim. To prove tortious interference with an existing or prospective contract under Pennsylvania law, a plaintiff must establish four elements: (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant. BP Envt'l Servs., Inc. v. Republic Servs., Inc., ___ F. Supp. 2d ___, 2013 WL 2182740, at *3 (E.D. Pa. May 21, 2013). For a claim of tortious interference with prospective contracts, the plaintiff must show "that it is reasonably probable that, but for the wrongful acts of the defendant, the plaintiff would have had a contractual relationship with a third party." Id. at *7.

Plaintiff's sole argument in support of this claim is as follows:

In the instant case, Plaintiff was qualified to be a bank manager. He had more than four (4) years experience in the banking industry. Blackwell-Murray Dep. at 18, 48–49, Ex. 1, Ex. 2. Plaintiff applied to over twenty (20) banks in the region after his termination with Defendant. Blackwell 1–13. He was interviewed for several positions. Id. In many of his interviews, his tenure with PNC or his relationship with Bell were explicitly mentioned by the interviewer. Id. His application process spanned more than two (2) years. Id. Plaintiff was not offered a position with any of the banks that he applied to, despite his experience. Plaintiff's experience in the field, the closeness of relationship between regional banks, Plaintiff's testimony of the comments that were made to him during interviews and the amount of banks he applied to over such a long period of time without securing a position create the strong inference that Defendant intended to harm Plaintiff by contacting prospective bank employers in the region. Therefore, Plaintiff has demonstrated that there is a genuine issue of material fact as to whether he has met the elements of Tortious Interference with Employment Relations.

(Pl.'s Opp'n Summ. J. 11.)

This argument fails to meet Plaintiff' summary judgment burden as to any of the elements of his claim. Aside from his own speculative testimony that he was qualified the jobs for which he applied,[11] Plaintiff has produced no evidence—such as affidavits or deposition testimony from the prospective employers—to suggest the existence of any reasonably possible business relationships.

Moreover, Plaintiff fails to create a genuine issue of material fact that Ms. Bell ever actually interfered with prospective employment relationships. Indeed, Plaintiff admitted that he does not know what, if anything, was ever said to any potential employer:

---

[11] Specifically, Plaintiff testified as follows:

Q.    How do you know you didn't get positions because of anything PNC did or said?

A.    Because if you looked in her all the interviews I've been on I've been banned from going to an open house. I had people—I get to the last stage, everything has gone will with the interviews. They cancel the interviews. I've had people, everything is going great. They say we got to do our background reference check. The next thing I'm not getting any phone calls back.

(Blackwell-Murray Dep. 299:8–20.)

Q. You put in here if you look at the last page, PNC has destroyed my reputation throughout the tri-state area with the banking industry. Do you know if anyone from PNC has commented to any of your prospective employees or anyone in the banking industry about your employment and your termination?

A. Yes.

Q. Who?

A. Judy Bell.

Q. Who has she talked with about your employment?

A. I'm not certain of the exact individual she spoke with.

Q. How do you know she spoke with anyone about your employment?

A. Because I had a conversation with her after I was terminated. And she told me that she did speak to some people about my employment at PNC.

Q. Who did she tell you she spoke with?

A. She didn't say.

Q. When did she tell you she spoke with them?

A. She didn't give me exact dates.

Q. Has anyone told you that they've spoken with Judy Bell about your employment at PNC?

A. No.

. . .

Q. But you don't know anyone that she's spoken with?

A. Correct.

Q. And no one has told you that they've spoken with Judy?

A. Correct.

Q. How do you know that she violated the policy?

A. Because I had that conversation and she said she spoke to a few prospective employers about me.

Q. And you don't know who those employers are?

A. No.

Q. And you don't know who she spoke with?

A. No.

Q. How many times did she speak with them?

A. She didn't say.

Q. When did she speak with them?

A. She didn't say.

Q. When did you speak with Judy after you left PNC's employment?

A. This was about I want to say in 2010. It was roughly around October of 2010 I had this conversation with her.

Q. Did you call her on the telephone?

A. Yes.

Q. Why did you call her?

A. Because I wanted to find out what was going on because I kept getting denied over and over again for positions.

36

Q. What did you say to Judy?  Did you leave her a voice mail or did you actually speak with her?

A. Both.

Q. You called her cell phone?

A. Cell phone and her office phone.

Q. What did you say to her?

A. I asked her, Has anybody contacted you about my employment with PNC?

Q. What did she say?

A. She said yes.

Q. What did she say she told them?

A. She didn't

Q. Who did she say contacted her?

A. She didn't.

Q. Did she tell you if she ever returned anyone's phone call who tried to contact her?

A. She didn't go into detail about it.

Q. So you have no idea what she said?

A. No.

Q. And none of your prospective employers have told you that PNC has said anything about your employment, correct?

A. No.

Q. How do you know you didn't get positions because of anything PNC did or said?

A. Because if you looked in here all the interviews I've been on I've been banned from going to an open house.  I had people—I get to the last stage, everything has gone well with the interviews.  They cancel the interviews.  I've had people, everything is going great.  They say we got to do our background reference check.  The next thing I'm not getting any phone calls back.

Q. How do you know it's PNC and not Bank of America?

A. Because nothing happened at Bank of America.

Q. Even though you sued them for discrimination?

A. I never sued them.

Q. You didn't sue—Bank of America you filed a charge of discrimination with them?

A. That's it, yes.

Q. So you don't know why these prospective employers aren't hiring you.  You just think it's PNC, correct?

A. And because I spoke with Judy.  And I know she said she spoke to a few prospective employers.

Q. She told you she was contacted, correct?

A. Correct.

Q. She didn't tell you she spoke with them, correct?

A. Yes, she did.  She said I spoke with a few people that contacted me.

37

| Q. | Okay. What did she tell you she said to them? |
|----|----|
| A. | She didn't say. |
| Q. | Did you ask? |
| A. | Yes. She didn't elaborate. |
| Q. | How long was this telephone conversation you had with Ms. Bell? |
| A. | Roughly about five or ten minutes. |
| Q. | How many employers did she tell you contacted her? |
| A. | She didn't. |

(Blackwell-Murray Dep. 294:15–301:14.) For all Plaintiff knows, Bell could have simply confirmed that Plaintiff had worked with her or described his role at PNC. Nothing in the record suggests that she made any negative comments about Plaintiff that hindered his ability to obtain future employment.

Finally, although Plaintiff suggests that there is a "strong inference" that Defendant intended to harm Plaintiff, he offers no evidence to that effect. Given that he does not even know the who, what, where, and when of the alleged disparaging statements, Plaintiff is hard-pressed to argue that there was an intent to interfere.

In light of the complete absence of evidence to establish any element of this claim, the Court must grant Defendant's Motion on this claim. As such, judgment shall be entered in favor of Defendant and against Plaintiff.

## IV. CONCLUSION

In sum, the Court must grant Defendant's Motion for Summary Judgment in its entirety. With respect to Plaintiff's claims for racial discrimination under Title VII and the PHRA, Plaintiff has failed to create a genuine issue of material fact as to (1) whether his termination occurred under any circumstances giving rise to a reasonable inference of discrimination or (2) whether Defendant's legitimate non-discriminatory reason for termination was pretextual. As to his WPCL claim, Plaintiff has produced no evidence to suggest that he had earned any incentive

38

payments or that he was still qualified for such payments even after his termination. Finally, with respect to his tortious interference claim, Plaintiff fails to show the existence of any prospective contractual relationships or an intent to harm on the part of PNC. Given such findings the Court must enter judgment on the entirety of the Complaint in favor of Defendant and against Plaintiff.

An appropriate Order follows.